

10 CV 7244

DORSEY & WHITNEY LLP
Bruce R. Ewing (BE-0724)
Brooke E. Pietrzak (BP-7314)
Gianfranco G. Mitrione (GM-8618)
250 Park Avenue
New York, New York 10177
(212) 415-9200

Attorneys for Plaintiff
Hard Rock Cafe International (USA), Inc.

RECEIVED
SEP 21 2010
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| HARD ROCK CAFE INTERNATIONAL (USA), INC., | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| HARD ROCK HOTEL HOLDINGS, LLC, HARD ROCK HOTEL, INC., HRHH IP, LLC, MORGANS HOTEL GROUP CO., MORGANS HOTEL GROUP MANAGEMENT, LLC, DLJMB HRH VOTECO LLC, TURNER BROADCASTING SYSTEM, INC., BRAD LACHMAN PRODUCTIONS, INC. and GENCO ENTERTAINMENT, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Hard Rock Cafe International (USA), Inc., by its attorneys, Dorsey & Whitney

LLP, for its Complaint against Defendants Hard Rock Hotel Holdings, LLC, Hard Rock Hotel,

Inc., HRHH IP, LLC, Morgans Hotel Group Co., Morgans Hotel Group Management, LLC,

DLJMB HRH VoteCo LLC, Turner Broadcasting System, Inc., Brad Lachman Productions, Inc.

and Genco Entertainment, Inc. (collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.      Plaintiff, the owner of the iconic trademarks HARD ROCK, HARD ROCK CAFE, HARD ROCK HOTEL, HARD ROCK CASINO, HARD ROCK LIVE and related marks, brings this action in order to protect the enormous goodwill in its world-renowned trademarks from being systematically diminished, devalued and damaged by the wrongful conduct of Defendants, most of whom operate or have authorized others to operate certain hotel-casinos in parts of the western half of the United States, including the Hard Rock Hotel & Casino in Las Vegas, Nevada.  Defendants are licensees of Plaintiff or entities in privity with licensees of Plaintiff who are using the trademarks HARD ROCK HOTEL, HARD ROCK CASINO and related trademarks in a manner that has intentionally, materially breached the terms of a 1996 license agreement entered into with Plaintiff's predecessor and that violates Plaintiff's trademark rights under federal and New York law.

2.      Among other misconduct described herein, Defendants have caused Plaintiff's famous trademarks to become associated with objectionable and offensive conduct that is at odds with the brand imagery of the HARD ROCK trademarks; used and/or authorized others to use Plaintiff's trademarks in a manner not permitted under the aforementioned license agreement; as to some Defendants, registered Internet domain names to which they have no right; and, most importantly, failed to use their best efforts to protect the goodwill associated with Plaintiff's trademarks established over many years among U.S. consumers.

3.      As a consequence of Defendants' material breaches of contract and violations of federal and state law, Plaintiff is entitled to the termination of the 1996 license agreement, the entry of permanent injunctive relief against all future use by Defendants or those in privity with them of all of Plaintiff's HARD ROCK trademarks, an award of monetary damages, an accounting of Defendants' profits, and other relief aimed at ensuring that the substantial goodwill

built up over so many years in Plaintiff's HARD ROCK trademarks is not further eroded by Defendants' wrongful conduct.

## PARTIES, JURISDICTION AND VENUE

4.      Plaintiff Hard Rock Cafe International (USA), Inc. ("HRCI") is a corporation organized and existing under the laws of the State of Florida, having a principal place of business at 6100 Old Park Lane, Orlando, Florida 32835.

5.      On information and belief, Defendant Hard Rock Hotel Holdings, LLC ("HR Holdings") is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business located at 4455 Paradise Road, Las Vegas, Nevada 89109.

6.      On information and belief, Defendant Hard Rock Hotel, Inc. ("HR, Inc.") is a corporation organized and existing under the laws of the State of Nevada, with a principal place of business located at 4455 Paradise Road, Las Vegas, Nevada 89109.  On information and belief, HR, Inc. is a subsidiary of HR Holdings.

7.      On information and belief, Defendant HRHH IP, LLC ("HR IP") is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business located at 475 Tenth Avenue, New York, New York 10018.

8.      On information and belief, Defendant Morgans Hotel Group Co. ("Morgans Hotel") is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business located at 475 Tenth Avenue, New York, New York 10018.  On information and belief, Morgans is an owner, member and/or manager of Defendant HR Holdings.

9.      On information and belief, Defendant Morgans Hotel Group Management, LLC ("Morgans Management") is a limited liability company organized and existing under the laws

of the State of Delaware, with a principal place of business located at 475 Tenth Avenue, New York, New York 10018.  On information and belief, Morgans Management is a subsidiary of Morgans Hotel and operates HR Holdings' Hard Rock Hotel & Casino in Las Vegas, Nevada.

10.     On information and belief, Defendant DLJMB HRH VoteCo LLC ("DLJ") is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business located at One Madison Avenue, 11th Floor, New York, New York 10010.  On information and belief, DLJ is also an owner, member and/or manager of Defendant HR Holdings.

11.     On information and belief, Defendant Turner Broadcasting Systems, Inc. ("Turner") is a corporation organized and existing under the laws of the State of Georgia with a principal place of business located at One CNN Center, Atlanta, Georgia 30303.

12.     On information and belief, Defendant Brad Lachman Productions, Inc. is a corporation organized and existing under the laws of the State of California with a principal place of business located at 4450 Lakeside Drive, Suite 280, Burbank, California 91505.

13.     On information and belief, Defendant Genco Entertainment, Inc. ("Genco") operates as a division of Defendant Brad Lachman Productions, Inc. and is a corporation organized and existing under the laws of the State of California with a principal place of business located at 15821 Ventura Boulevard, No. 500, Encino, California 91436 (Defendants Brad Lachman Productions, Inc. and Genco are collectively referred to herein as "Lachman").

14.     This is a civil action for declaratory and other relief arising out of intentional, material breaches of contract perpetrated by Defendants HR IP and HR Holdings, and against all Defendants for trademark dilution, trademark infringement and unfair competition in violation of

Sections 32(1) and 43(a)(1)(A) and (c) of the U.S. Trademark Act of 1946 (the "Lanham Act"), as amended, 15 U.S.C. §§ 1114(1) and 1125(a)(1)(A) and 1125(c), and New York State law.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1338.  The matter in controversy exceeds the sum or value of $75,000.

16.     The exercise of personal jurisdiction over Defendants HR IP, Morgans Hotel, Morgans Management and DLJ is appropriate under New York CPLR 301, in that New York, upon information and belief, is the principal place of business of these Defendants.  As to Defendants HR Holdings and HR IP, New York is the contractually designated forum for the resolution of any claims arising out of or relating to the license agreement to which HRCI, HR IP and HR Holdings are parties.  All Defendants are subject to the exercise of personal jurisdiction over them in New York under CPLR 302.

## FACTS

### A.     HRCI and Its Famous HARD ROCK Trademarks

17.     In 1971, two Americans, Peter Morton and Isaac Tigrett, HRCI's predecessors in interest, opened the first HARD ROCK CAFE in London, England as a tribute to rock music and the many unique and varied rock artists who have entertained billions of people around the world since the rock 'n roll era began in the late 1940s and early 1950s.  From the beginning, the HARD ROCK trademarks and brand became associated with dining and entertainment experiences focused on quality "all American" style food at relatively moderate prices in an atmosphere devoted to celebrating the history of rock music.

18.     As part of a strategy to create a brand image associated with rock music in a way that no other entrepreneurs before them had conceived, Morton and Tigrett began acquiring memorabilia associated with rock music for display in the first HARD ROCK CAFE, and then

subsequently for other restaurants that began opening in the late 1970s under the HARD ROCK CAFÉ trademark.  Beginning with a guitar given by Eric Clapton, the music memorabilia collection now owned or controlled by HRCI and its affiliates has grown to include more than 70,000 items, including Elvis Presley's motorcycle, Michael Jackson's storied sequined glove, the wedding dress Madonna wore in her "Like a Virgin" music video and countless gold records, guitars, newspaper clippings and other items that consumers around the world associate with rock music and the HARD ROCK brand.  In words attributed to the late pop artist Andy Warhol, the HARD ROCK CAFE is the "Smithsonian of Rock 'n Roll."

19.     Over time, Morton and Tigrett gradually expanded their business to include a worldwide network of restaurants operated under the HARD ROCK CAFE trademark.  Today, there are 134 HARD ROCK CAFE restaurants located around the world, 44 in the United States alone, including locations at Times Square and Yankee Stadium in New York City and in Niagara Falls, New York.  HRCI's revenues earned through its U.S. HARD ROCK CAFE restaurants exceeded $200 million in 2009 and $1 billion between 2005 and 2009.

20.     Since 1995, the expansion of the HARD ROCK brand has gone beyond restaurants to include hotels, casinos and live music venues.  In the U.S., HRCI and its affiliates operate or license third parties to operate hotels under the HARD ROCK HOTEL trademark in Chicago, Orlando and San Diego and hotel/casinos under the trademark HARD ROCK HOTEL & CASINO in Biloxi, Mississippi, Tampa, Florida and Hollywood, Florida.  All of these properties are luxury destinations that regularly garner top rankings from organizations like the American Automobile Association.  In addition, the Biloxi, Hollywood and Orlando properties all operate live concert venues under the trademark HARD ROCK LIVE that feature top rock music acts on a year-round basis.  Revenues earned through these U.S. HARD ROCK HOTEL

and HARD ROCK HOTEL & CASINO operations exceeded $1.5 billion in 2009 and $6 billion between 2005 and 2009.

21.    Apart from its use in connection with restaurants, hotels, casinos and entertainment venues, HRCI's HARD ROCK trademark has been used ubiquitously in connection with merchandise, most prominently on t-shirts featuring the HARD ROCK CAFE and Design trademark depicted in Exhibit 1 hereto that is known around the world.  Apart from t-shirts and other apparel, the HARD ROCK trademark is used in connection with pins, glassware, music-related souvenirs, posters and other printed materials, along with a wealth of other goods. Worldwide, more than ten million pieces of branded HARD ROCK merchandise are sold each year, six million in the U.S. alone.   U.S. revenues earned by HRCI on sales of HARD ROCK merchandise in 2009 exceeded $90 million and $500 million between 2005 and 2009.

22.    In terms of advertising and promotion, the HARD ROCK brand is the subject of vast advertising and promotional efforts and an extraordinary degree of unsolicited media coverage in the U.S.  Most U.S. HARD ROCK CAFE restaurants regularly host musical performances by well known rock musicians that draw the attention of the press and public, as do the various HARD ROCK HOTEL and HARD ROCK HOTEL & CASINO properties. Multiple television specials devoted to showcasing live music from the world's best known rock musicians have been sponsored under the HARD ROCK trademark, such as "Hard Rock Live!," which aired in the U.S. from 1997-2001.  Advertising for various HARD ROCK establishments appears in U.S. local and national publications.  Since 2006, the HARD ROCK trademark has become associated with an annual "Ambassadors of Rock" tour that has featured stops at various locations in the U.S. and around the world.  On top of this, the Internet website "hardrock.com" is a central focus of marketing efforts for the HARD ROCK trademarks and brand.  In 2009,

over 18 million consumers from around the world visited the "hardrock.com" website. Expenditures by HRCI and its U.S. licensees on the advertising and promotion of its various HARD ROCK goods and services exceeded $17 million in 2009 and $97 million between 2005 and 2009.

      23.     HRCI and its affiliates have not only turned the HARD ROCK trademark into one of the world's foremost brands that is inextricably associated with rock music, they have used that brand platform to further multiple philanthropic causes. For example, HARD ROCK CAFE restaurants located around the world sell Signature Series Limited Edition t-shirts designed in collaboration with well known rock-music artists such as Eric Clapton, Bruce Springsteen, Bono and Stevie Nicks, and a portion of the proceeds from such sales is donated to charities designated by these artists. Through these and other charitable activities, HRCI and its affiliates have raised tens of millions of dollars for charities located around the world, honoring HRCI's motto that appears on the wall of every single HARD ROCK CAFE restaurant: "Love All, Serve All."

      24.     As a result of decades of use, extensive amounts of advertising, publicity and unsolicited media coverage, the trademarks HARD ROCK, HARD ROCK CAFE, HARD ROCK HOTEL, HARD ROCK CASINO, HARD ROCK HOTEL & CASINO, HARD ROCK LIVE and other HARD ROCK trademarks or variations thereof (collectively, the "HARD ROCK Marks") have been famous among the general consuming public of the United States as a whole for more than twenty years and have become symbols of vast consumer goodwill that is uniquely associated in the U.S. with HRCI, and that are of inestimable value to HRCI. In the words of Defendant HR Holdings contained in filings it made with U.S. regulators as recently as 2009, "the 'Hard Rock' name has grown to become widely recognized throughout the world."

25. In the U.S., HRCI is the owner of multiple HARD ROCK trademarks that are registered with the U.S. Patent & Trademark Office, many of which are incontestable under 15 U.S.C. § 1065. Among these incontestable registrations, copies of which are attached hereto collectively as Exhibit 2, are: U.S. Trademark Reg. Nos. 2,478,328 for HARD ROCK covering clothing, retail store, live music and other entertainment services; 1,397,180 for HARD ROCK CAFE covering restaurant services; 1,504,904 for HARD ROCK CAFE covering apparel; 1,398,940 for HARD ROCK CAFE and Design covering restaurant services; 1,408,637 for HARD ROCK CAFE covering apparel; 1,909,483 for HARD ROCK HOTEL covering hotel services; 2,031,803 for HARD ROCK HOTEL covering casino services; 2,038,394 for HARD ROCK HOTEL covering apparel; 2,789,028 for HARD ROCK CASINO covering music entertainment, hotel, casino and restaurant services; 2,499,114 for HARD ROCK CASINO covering clothing, jewelry and related merchandise; 2,349,579 for HARD ROCK LIVE covering live music concerts; 2,373,803 for HARD ROCK LIVE covering restaurant services; and 2,561,989 for HARD ROCK LIVE covering apparel (collectively, and together with other U.S. trademark registrations for various HARD ROCK Marks, the "Hard Rock Registrations").

26. All of the foregoing Hard Rock Registrations, as well as many other U.S. trademark registrations and applications not referenced herein that contain the term "HARD ROCK," are owned exclusively by HRCI.

**B.** **The 1996 License Agreement**

27. In or about 1990, The Rank Group, Plc ("Rank"), a corporation organized under the laws of the United Kingdom and the predecessor parent corporation of HRCI, acquired all of the interests of Isaac Tigrett in the business then operated under the HARD ROCK Marks that Tigrett had co-founded with Peter Morton.

28.     On or about June 7, 1996, Rank entered into a transaction with Peter Morton, in which Morton also sold to Rank his interests in the business then conducted under the HARD ROCK Marks, subject to certain exceptions.  As part of that transaction, Morton retained ownership of the Hard Rock Hotel & Casino he had opened in 1995 in Las Vegas, Nevada, as well as the option to develop additional properties under the trademarks HARD ROCK HOTEL and HARD ROCK CASINO in certain defined territories, notably including parts of the western half of the United States.  However, Rank acquired all right, title and interest to all HARD ROCK Marks registered and used around the world, and Morton received a license from a Rank subsidiary, Rank Licensing, Inc., to use the trademarks HARD ROCK HOTEL and HARD ROCK CASINO on a limited basis and subject to a number of conditions.  A copy of the June 7, 1996 Trademark License and Cooperation Agreement by and between Rank Licensing, Inc. and Peter A. Morton (the "License Agreement") is attached hereto as Exhibit 3.

29.     In or about 1998, HRCI became the U.S. owner of all right, title and interest in the HARD ROCK Marks, succeeding to the rights of Rank Licensing, Inc. by assignment.  Upon information and belief, on or about February 2, 2007, in connection with a buyout of his remaining interests in businesses operated under trademarks HARD ROCK HOTEL and HARD ROCK CASINO, Morton assigned the rights granted to and obligations imposed on him under the License Agreement to Defendant HR IP.

30.     Since February 2, 2007, HR IP and HR Holdings have acted as licensees of HRCI under the License Agreement.  Among other things, HR IP and HR Holdings have represented to third-party sublicensees that HR IP and HR Holdings are licensees that are party to the License Agreement with HRCI and consequently authorized to sublicense their rights under that Agreement to third parties.

31.     Under paragraph 2(a) of the License Agreement, HR IP and HR Holdings were granted the limited, exclusive right to use the trademarks HARD ROCK CASINO and HARD ROCK HOTEL in certain limited geographic territories "solely in connection with the development, operation, ownership, management, operation of and promotion of Hard Rock Hotel/Casinos and Hard Rock Casinos."  HR IP and HR Holdings were not granted any rights under the License Agreement in any HARD ROCK Marks apart from HARD ROCK CASINO and HARD ROCK HOTEL, nor were they granted any rights in any HARD ROCK Marks covering restaurant services, concert venues or hotel services offered independently of a hotel/casino.  The License Agreement further provided in paragraph 2(a) that HR IP and HR Holdings "shall not use or exploit" the HARD ROCK CASINO and HARD ROCK HOTEL trademarks outside of the limited geographic territories specified in the License Agreement, "except, however, [HR IP and HR Holdings] may engage in the promotion, advertising or marketing (not including the sale of merchandise) and broadcasting of the Hard Rock Hotel/Casinos and Hard Rock Casinos anywhere in the world."

32.     Paragraph 2(b)(iii) of the License Agreement provides that HR IP and HR Holdings "shall not develop, use or exploit any Hard Rock Marks not expressly provided herein without the express written consent of [HRCI].  [HRCI] shall retain the sole right to apply for the registration or renewal of trademarks and service marks or other proprietary rights for the [trademarks HARD ROCK CASINO and HARD ROCK HOTEL] in the Morton Territories."  Paragraph 1(k) of the License Agreement defines "Morton Territories" to include, among certain international locations, the "State of Illinois and all states and possessions of the United States which are located west of the Mississippi River, including the entire State of Louisiana, but excluding the State of Texas, except for the 'Greater Houston Area,' defined to mean that area

which lies within a fifty (50) mile radius from the City Hall or other similarly recognized civic

structure located reasonably near the geographic center of the City of Houston."

      33.     Paragraph 2(b)(vi) of the License Agreement requires HR IP and HR Holdings to

use the trademarks HARD ROCK CASINO and HARD ROCK HOTEL "with respect to the

location of the words in the design logo, only in the manner set forth in Exhibit C . . . with the

words Hard Rock Hotel or Hard Rock Casino within the circle logo and the geographic or other

designation described herein below the circle logo," as depicted below in Exhibit C to the

License Agreement:



Paragraph 2(b)(vii) of the License Agreement also authorizes HR IP and HR Holdings to use a

variation of the foregoing design in connection with casino and hotel/casino services, as depicted

below in Exhibit D to the License Agreement:



Beach Club*

*Or Athletic Club

34.     Paragraph 3(a) of the License Agreement states that "[a]ll rights not specifically granted to [HR IP and HR Holdings] hereunder are expressly reserved by [HRCI].  Paragraph 3(b) of the License Agreement confirms that HR IP and HR Holdings "recognize[] the value of the goodwill" associated with the HARD ROCK HOTEL and HARD ROCK CASINO trademarks.

35.     Paragraph 3(d) of the License Agreement provides that HR IP and HR Holdings "agree[] not to use any word, words, term or terms in conjunction with the [HARD ROCK HOTEL and HARD ROCK CASINO trademarks] to identify his or its company and/or [licensed services] which in any way would dominate, modify or qualify the [HARD ROCK HOTEL and HARD ROCK CASINO trademarks] other than geographical designations."

36.     Paragraph 6(a) of the License Agreement provides that HRCI, HR IP and HR Holdings "agree to use their best efforts to protect the [HARD ROCK HOTEL and HARD ROCK CASINO trademarks] and the goodwill associated therewith."

37.     Paragraph 6(b) of License Agreement provides, *inter alia*, that HR IP and HR Holdings shall not "at any time apply for any registration of any copyright, trademark or other

designation which would affect the ownership of or encumber, damage, dilute or modify the [HARD ROCK HOTEL or HARD ROCK CASINO trademarks] nor file any document requesting any governmental authority to take any action nor take any action itself which would affect the ownership of or damage, dilute or modify the [HARD ROCK HOTEL or HARD ROCK CASINO trademarks]."

38.     Paragraph 6(c) of the License Agreement states that HR IP and HR Holdings "shall at no time use or authorize the use of any service mark, trademark, trade name or other designation identical with or confusingly similar to the [HARD ROCK HOTEL or HARD ROCK CASINO trademarks]."

39.     Paragraph 10 of the License Agreement authorizes HR IP and HR Holdings to sublicense or franchise the rights granted to them under the License Agreement, but any sublicensee or franchisee must agree to "assume, observe and perform all of the obligations of [HR IP and HR Holdings] and be bound by all of the restrictions under this Agreement and [HR IP and HR Holdings] shall provide a copy of such sublicense or franchise to [HRCI]."

40.     Paragraph 14 of the License Agreement contains a New York choice-of-law provision and states that, subject to a narrow exception not applicable to the claims asserted herein, "any claims arising out of or relating to this Agreement shall be prosecuted in the state and federal courts located in New York."

**C.     The Material Breaches of the 1996 License Agreement and Other Misconduct Violative of HRCI's Trademark Rights**

I.      "Rehab: Party at the Hard Rock Hotel"

41.     Upon information and belief, in or about November 2008, Defendant Turner began airing on its truTV cable television channel a program entitled "Rehab: Party at the Hard Rock Hotel" ("Rehab").  Rehab has aired nationally across the United States, including within

the State of New York, and, upon information and belief, has also been licensed for broadcast internationally.

42.     Upon information and belief, Rehab is produced by Defendant Lachman.  Upon information and belief, Lachman has produced and Turner has broadcast the first two seasons of Rehab, consisting of eighteen episodes that originally aired between November 2008 and November 2009, and that have subsequently been re-run by Turner.

43.     Upon information and belief, a third season of Rehab began airing on September 7, 2010 on truTV.  Upon information and belief, the third season of Rehab is produced by Lachman and broadcast by Turner.

44.     Rehab is a "reality" television program that purports to depict events occurring during pool parties held on Sundays at the Las Vegas property that is owned, upon information and belief, by Defendant HR Holdings and/or HR, Inc., and that does business under the trademark HARD ROCK HOTEL & CASINO licensed by HRCI to HR IP and HR Holdings.

45.     Upon information and belief, the two primary members of Defendant HR Holdings are Defendants Morgans Hotel and DLJ.  Upon information and belief, Defendants Morgans and DLJ directly control the business and operations of Defendants HR Holdings, HR IP and HR, Inc.  Upon information and belief, Defendant Morgans Management manages the operations of the Las Vegas property that does business under the trademark HARD ROCK HOTEL & CASINO licensed by HRCI to HR IP and HR Holdings.

46.     Upon information and belief, Defendants HR Holdings, HR, Inc., HR IP, Morgans Hotel, Morgans Management and DLJ have all directly authorized, controlled and participated in the misconduct that is the subject matter of this Complaint, including but not

limited to authorizing Turner and Lachman to create and air Rehab, and to include HRCI's

HARD ROCK HOTEL trademark in the title of that television program.

47.     The behavior depicted in the Rehab television program that is authorized, created

and distributed by Defendants is entirely at odds with the brand image of the HARD ROCK

Marks and is likely to damage and has damaged the goodwill of the HARD ROCK Marks among

consumers.  Among other things, Rehab portrays the Las Vegas HARD ROCK HOTEL &

CASINO, a property operated under trademarks owned and licensed by HRCI, as a destination

that revels in drunken debauchery, acts of vandalism, sexual harassment, violence, criminality

and a host of other behavior that most members of the general consuming public of the United

States who regularly frequent or are potential patrons of HRCI's HARD ROCK CAFE

restaurants and other properties operated under the HARD ROCK Marks would find unseemly

and objectionable.

48.     In addition, Rehab portrays the staff of the Las Vegas HARD ROCK HOTEL &

CASINO as unprofessional, incompetent, and/or physically and emotionally abusive to hotel

guests and other staff.  HRCI prides itself on offering guests at its HARD ROCK CAFE

restaurants and other properties operated under the HARD ROCK Marks dining and

entertainment experiences that are pleasurable, fun and consistent with the democratic free spirit

of rock music.  In contrast, Rehab associates HRCI's HARD ROCK Marks with conduct on the

part of both hotel guests and staff that is offensive, depraved and deeply damaging to the HARD

ROCK Marks and their inherent goodwill.

49.     Defendants HR Holdings, HR, Inc., HR IP, Morgans Hotel, Morgans

Management and DLJ have further damaged the extensive goodwill inherent in the HARD

ROCK Marks by allowing their Rehab pool parties and the HARD ROCK HOTEL and HARD

ROCK CASINO trademarks owned by HRCI to become associated with criminal activity.  Upon

information and belief, Las Vegas police made highly publicized arrests in September 2009 at a

Rehab pool party held on the premises of the Las Vegas Hard Rock Hotel & Casino, charging

eight patrons with having engaged in acts of solicitation of prostitution and drug distribution.

      50.     The offensive nature of Rehab and the negative associations it has created among

consumers with respect to the HARD ROCK Marks are confirmed by communications HRCI has

received from members of the public who mistakenly believe that HRCI is responsible for the

Rehab television program and the events depicted in it.  Excerpts from such communications

include the following:

      a.     "My wife and I have been big fans and repeat customers of your Orlando property.  However, upon viewing the first two episodes of Tru TV's 'Party at the Hard Rock' I can no longer continue to support your company. . . . I have never been to Vegas, but I can tell you that the Hard Rock isn't the only hotel in Orlando, and my wife and I have decided to find a new place to party."

      b.     "After watching episodes on Trutv of Rehab , I feel I have to give you my opinion concerning how rehab is run. . . . Your pool Manager is so unprofessional, he feels yelling at his employees will improve their performance,it's has the opposite result. He yells at them, flirts with them, yells at them again and then tells them he's sorry for his behavior. . . . I hope this was all staged for TV and not really how your employees conduct themselves in the workplace.  If it is staged then your making your place of business look ridiculous."

      c.     "I have just got done watching another episode of Rehab and I have to tell you that I am so upset that I had to get out of bed and post. . . . I have to say that my group of people will NEVER EVER stay at the Hard Rock again!!  I have talked to many many people about the way Matt goes about putting people down and how he treats his employees and basically what an idiot he is. . everybody agrees that they will never go to The Hard Rock again. . . . For such a big corporation, you are putting out a really disturbing picture of all of your establishments.  It bothers me to the core of my being.  LOSE MATT OR LOSE YOUR REPUTATION!"

      d.     "I have watched this season's episodes of Rehab and I must say after seeing the behavior of Matt, I am certain that I will not be attending any more events at Hard Rock in Dallas or any other city.  In addition, I will recommend to those I know planning events that they choose other venues.  His behavior is deplorable and if those are the types of individuals that Hard Rock promotes, then your venue is not a venue that I ever want to frequent again."

e.      "My wife and I travel to Las Vegas every other year and stay at the Hard Rock; I'm sorry to tell you that our family will not stay there ever again.  I saw Rehab on TruTV and was appalled by your 'Little Hitler' Matt- the so-called manager.  I never would take the time to write such an e-mail, but watching him call your employee's "stupid" and a "whore" just angered me to the point where I felt compelled to write.  His only management technique is "I'm gonna fire you".  He also says things like "it's her time of the month".  Can't decide if it's a moronic attempt by HardRock to boost ratings, but your sorry butts should be sued by your employees for allowing and creating a hostile work environment, and sexual harrassment!!??!!  I do expect an answer and will not come to HardRock unless I hear from management, also I will tell everyone I meet and have an opportunity to speak with, do not spend your money at Hard Rock."

51.      Notwithstanding assurances provided by officers of HR Holdings after the airing

of the first two seasons of Rehab that they would address the objectionable associations the

program was creating with the HARD ROCK Marks, the third season of Rehab continues to

depict the same offensive and depraved conduct portrayed in the first two seasons.  Shortly after

the first episode of the third season of Rehab aired, HRCI received numerous communications

from members of the public who mistakenly believe that HRCI is responsible for the offensive

conduct that is damaging to the HARD ROCK Marks and their inherent goodwill.  Excerpts from

these more recent email communications include the following:

a.      "This is to express my sincere disgust with the conduct of one of your employees at the Las Vegas property.  This Nightlife Manager, Matt, is vulgar, condescending, arrogant and a despicable bully to the staff of the Rx pool facility.  His conduct is unbecoming of someone who you entrust to be a spokesman and representative of your company.  It's laughable that your firm tolerates his despicable behavior, and the way he speaks to your other employees is not only unprofessional, its also dangerous from an HR perspective that undoubtedly will subject your company to US labor law violations and probable litigation.  His threats of firing staff is a textbook example of how NOT to be a successful and respected senior manager of a major US corporation.  Your toleration of this behavior is shameful and for that you are equally responsible for the negative toxic environment that your staff is subjected to at their place of work because of the conduct of your Nightlife Manager in Las Vegas."

b.      "I would just like to say really quick that your General Manager of all nightlife Matt, is a total moron and jerk that has no consideration of anybody's feeling including not only his staff, but customers as well.  It should honestly embarrese you to still have an employee of such high stature that gives your company such a horrible name... After attending Rehab for over 4 years with 6+ friends and spending upwards of $20,000 dollars on bottles and cabanas/daybeds, we have decided not to ever come to Rehab ever again. . . .  I have no idea how you guys dont have multiple lawsuits on you. The shit he put's his employees through is

absolutely unacceptable. The favoritism, sexism, unprofessionalism, is ludicrous and im extremely disappointed you have kept this guy around this long.   Your executives might want to watch the first episode of season 3 of your show and see how bad this jackass is tarnishing your company's name...''

52.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 2(a) of the License Agreement by authorizing Turner and Lachman to use the HARD ROCK HOTEL trademark in the title of Rehab, without authorization from HRCI.

53.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 3(d) of the License Agreement by authorizing Turner and Lachman to use the HARD ROCK HOTEL trademark in the title of Rehab in such a way that the HARD ROCK HOTEL trademark is dominated, modified or qualified by the remainder of Rehab's title.

54.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 6(a) of the License Agreement by failing to use their best efforts to protect the HARD ROCK HOTEL and HARD ROCK CASINO trademarks and the goodwill associated therewith. To the contrary, by authorizing Turner and Lachman to create and air Rehab on a national and international basis, and thereby causing the HARD ROCK Marks to become associated with unsavory, offensive conduct that the majority of the American consuming public finds to be objectionable, and through other misconduct of a similar nature, Defendants HR IP and HR Holdings are affirmatively damaging the goodwill inherent in the HARD ROCK HOTEL and HARD ROCK CASINO trademarks.

55.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 6(b) of the License Agreement by authorizing Turner and Lachman to create and air Rehab, and by engaging in other misconduct of a similar nature, thereby causing the HARD ROCK Marks to be diluted and damaged among members of the American consuming public.

56.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 10 of the License Agreement by failing to provide HRCI with a copy of the sublicense agreement, if any, authorizing Turner and Lachman to use the trademark HARD ROCK HOTEL in the title of Rehab.  To the extent no such sublicense exists, the failure of HR IP and HR Holdings to obtain written commitments from Turner and Lachman regarding the use of the HARD ROCK HOTEL trademark and to abide by the terms of the License Agreement is itself a violation of paragraph 10 of the License Agreement.

57.     The knowing and intentional creation and broadcast of Rehab by Turner and Lachman using a title that includes the HARD ROCK HOTEL trademark without the authorization of HRCI, but with the full knowledge and direct approval, authorization and participation of HR IP, HR Holdings, HR, Inc., Morgans Hotel, Morgans Management and DLJ, as well as other willful misconduct of a similar nature, exceeds the scope of the License Agreement and has caused and is likely to cause consumers in both New York and the United States as a whole to believe wrongly that HRCI has either sponsored, authorized or approved of Rehab and the offensive conduct depicted in it.  Such actual and likely confusion has caused and is likely to cause substantial damage to the HARD ROCK Marks and the goodwill inherent therein.  Upon information and belief, such conduct on the part of all Defendants is willful, intentional and represents a bad-faith effort to trade unfairly on HRCI's goodwill embodied in the HARD ROCK Marks.

58.     The knowing and intentional creation and broadcast of Rehab by Turner and Lachman using a title that includes the HARD ROCK HOTEL trademark without the authorization of HRCI, but with the full knowledge and direct approval, authorization and participation of HR IP, HR Holdings, HR, Inc., Morgans Hotel, Morgans Management and DLJ,

as well as other willful misconduct of a similar nature, exceeds the scope of the License Agreement and has diluted and is likely to dilute the goodwill and distinctive quality inherent in HRCI's famous and distinctive HARD ROCK Marks in both New York and the U.S. as a whole. Such dilution has caused and is likely to cause substantial damage to the HARD ROCK Marks and the goodwill inherent in them.  Upon information and belief, such conduct on the part of all Defendants is willful, intentional and represents a bad-faith effort to trade unfairly on HRCI's goodwill embodied in the HARD ROCK Marks

59.   HRCI has no adequate remedy at law for any of the misconduct described above and will suffer irreparable harm in the absence of the relief sought herein.

II.   Unauthorized and Violative Uses of the HRH Trademark

60.   Upon information and belief, Defendants HR Holdings, HR, Inc., HR IP, Morgans Hotel, Morgans Management and DLJ opened various new facilities at the Las Vegas HARD ROCK HOTEL & CASINO in or about December 2009 that they have branded using the acronym "HRH," which stands for HARD ROCK HOTEL.  Upon information and belief, among the facilities at the Las Vegas property bearing the HRH trademark are the "HRH Tower," the "HRH Beach Club," the "HRH Beach Club Bar & Grill" and "HRH Tower Spa Villas."

61.   Upon information and belief, Defendants HR Holdings, HR, Inc., HR IP, Morgans Hotel, Morgans Management and DLJ have also begun branding the Las Vegas Hard Rock Hotel & Casino as the HRH HARD ROCK HOTEL & CASINO, with the "HRH" acronym in many instances appearing in a position that is far more prominent than the HARD ROCK HOTEL & CASINO trademark owned by HRCI.  Representative specimens of advertising and promotional materials disseminated by these Defendants depicting the use of HRH HARD ROCK HOTEL & CASINO are attached as Exhibit 4.

62.     Upon information and belief, Defendants HR Holdings, HR, Inc., HR IP, Morgans Hotel, Morgans Management and DLJ have expanded the use of the "HRH" acronym in an attempt to create a sub-brand of the HARD ROCK Marks that they can claim possesses independent goodwill and is capable of being used independently of HRCI.

63.     However, as an acronym that stands for HRCI's HARD ROCK HOTEL trademark, "HRH" is a trademark that is exclusively owned by HRCI, as evidenced by HRCI's ownership of a registration issued by the U.S. Patent & Trademark Office to HRCI for the HRH trademark covering apparel, U.S. Reg. No. 3,652,867, and a pending, allowed application on file with the U.S. Patent & Trademark Office for HRH covering hotel, casino and restaurant services, both of which are attached hereto collectively as Exhibit 5.

64.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraphs 2(a) and 2(b)(iii) of the License Agreement by using the HRH trademark without authorization from HRCI and in a manner that is not permitted by the License Agreement.

65.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 3(d) of the License Agreement by using HRH as part of a new branding campaign such that HRCI's HARD ROCK HOTEL trademark is dominated, modified or qualified by the HRH trademark that immediately precedes it.

66.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 6(a) of the License Agreement by failing to use their best efforts to protect the HARD ROCK HOTEL trademark and the goodwill associated therewith, in that they have combined HRCI's HRH and HARD ROCK HOTEL trademarks in such a manner as to damage the goodwill inherent in both.

67.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 6(b) of the License Agreement by combining HRCI's HRH and HARD ROCK HOTEL trademarks in such a manner as to dilute the distinctive qualities of both marks.

68.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 6(c) of the License Agreement by using HRCI's HRH trademark that is confusingly similar to HRCI's HARD ROCK HOTEL trademark as a designation of source for their hotel and casino services.

69.     The knowing and intentional use of HRCI's HRH trademark without the authorization of HRCI, but with the full knowledge and direct approval, authorization and participation of HR IP, HR Holdings, HR, Inc., Morgans Hotel, Morgans Management and DLJ, exceeds the scope of the License Agreement and has caused and is likely to cause consumers in both New York and the United States as a whole to believe wrongly that HRCI has either sponsored, authorized or approved of the use of and the services offered under the HRH trademark, as misappropriated by these Defendants.  Such actual and likely confusion has caused and is likely to cause substantial damage to the HARD ROCK Marks and the goodwill inherent therein.  Upon information and belief, such conduct on the part of these Defendants is willful, intentional and represents a bad-faith effort to trade unfairly on HRCI's goodwill embodied in the HARD ROCK Marks, including HRCI's HRH trademark.

70.     The knowing and intentional use of HRCI's HRH trademark without the authorization of HRCI, but with the full knowledge and direct approval, authorization and participation of HR IP, HR Holdings, HR, Inc., Morgans Hotel, Morgans Management and DLJ, exceeds the scope of the License Agreement and has diluted and is likely to dilute the goodwill and distinctive quality inherent in HRCI's famous and distinctive HARD ROCK Marks in both

New York and the U.S. as a whole.  Such dilution has caused and is likely to cause substantial

damage to the HARD ROCK Marks and the goodwill inherent in them.  Upon information and

belief, such conduct on the part of these Defendants is willful, intentional and represents a bad-

faith effort to trade unfairly on HRCI's goodwill embodied in the HARD ROCK Marks,

including HRCI's HRH trademark.

71.     HRCI has no adequate remedy at law for any of the misconduct described above

and will suffer irreparable harm in the absence of the relief sought herein.

III.    Further Unauthorized Uses and Misuses of HRCI's HARD ROCK Marks

(i)     Tulsa Property

72.     Defendants HR IP, HR Holdings, HR, Inc., Morgans Hotel, Morgans

Management and DLJ have sublicensed or have authorized the sublicensing of the HARD

ROCK HOTEL and HARD ROCK CASINO trademarks to third parties, one of which is

Cherokee Nation Enterprises, which operates a Hard Rock Hotel & Casino in Tulsa, Oklahoma.

73.     The HARD ROCK Marks are used at the sublicensed Tulsa facility in a manner

that is inconsistent with the brand image HRCI has cultivated over many years.  Among other

things, the range of services, character of the establishment and the experience offered to

customers is incompatible with consumer expectations for goods and services branded with the

HARD ROCK Marks.  Upon information and belief, Defendants HR IP, HR Holdings, HR, Inc.,

Morgans Hotel, Morgans Management and DLJ have failed in their obligations to ensure that the

HARD ROCK Marks are used with the services in question in a consistent manner that does not

dilute or damage the goodwill embodied in such Marks.

74.     Defendants HR IP and HR Holdings have intentionally, materially breached

paragraphs 6(a) and 6(b) of the License Agreement by allowing the HARD ROCK Marks and

the goodwill inherent therein to become diluted and damaged through association with services offered at the Tulsa facility that are inconsistent with the associations consumers have developed with the HARD ROCK Marks.

75.    In addition, upon information and belief, with respect to the sublicensed Tulsa property, Defendants HR IP, HR Holdings, HR, Inc., Morgans Hotel, Morgans Management and DLJ have sublicensed or have purported to authorize the sublicensing of a graphic depiction of the HARD ROCK HOTEL & CASINO trademark depicted below that is not one of the trademarks whose use or sublicensing is authorized by the License Agreement in this manner.



Such unauthorized sublicensing, as depicted in Exhibit 6 hereto, which shows the use of the above-described trademark in a graphic presentation that is not authorized by HRCI, is an intentional, material breach of paragraphs 2(b)(iii), 2(b)(vi) and 2(b)(vii) of the License Agreement, which limit the graphic depictions of the HARD ROCK HOTEL and HARD ROCK CASINO trademarks that such Defendants are authorized to use, or to authorize third-party sublicensees to use.

76.    The unauthorized sublicensing of the HARD ROCK HOTEL & CASINO trademark depicted in paragraph 75 above is also an intentional, material breach of paragraphs

6(a) and 6(b) of the License Agreement because it damages the goodwill inherent in HRCI's HARD ROCK Marks and has caused them to become diluted.

77.     In addition, upon information and belief, Defendants HR IP, HR Holdings, HR, Inc., Morgans Hotel, Morgans Management and DLJ have authorized the proprietors of a restaurant located on the Tulsa property operated by Cherokee Nation Enterprises to use HRCI's HARD ROCK HOTEL & CASINO trademark in the manner depicted in Exhibit 7 hereto, in which HRCI's trademark is plainly subordinate to the name of the restaurant – "Toby Keith's I Love This Bar & Grill."

78.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 10 of the License Agreement by failing to provide HRCI with a copy of the agreement through which the proprietor of the above-described Tulsa restaurant has been granted the right to use HRCI's HARD ROCK HOTEL & CASINO trademark as depicted in Exhibit 7 hereto.  To the extent no such sublicense exists, the failure of HR IP and HR Holdings to obtain written commitments from the proprietor of the above-described Tulsa restaurant regarding the use of the HARD ROCK HOTEL & CASINO trademark and to abide by the terms of the License Agreement is itself a violation of paragraph 10.

79.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 2(a) of the License Agreement by authorizing the proprietor of the above-described Tulsa restaurant to use HRCI's HARD ROCK HOTEL & CASINO trademark without the consent of HRCI and in a manner that is not permitted by the License Agreement.

80.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 3(d) of the License Agreement by authorizing the proprietor of the above-described

Tulsa restaurant to use HRCI's HARD ROCK HOTEL & CASINO trademark in such a way that HRCI's trademark is dominated, modified or qualified by the terms that immediately precede it.

81.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 6(a) of the License Agreement by failing to use their best efforts to protect the HARD ROCK HOTEL and HARD ROCK CASINO trademarks and the goodwill associated therewith, in that they have combined or authorized others to combine HRCI's HARD ROCK HOTEL & CASINO trademark with the trademark "Toby Keith's I Love This Bar & Grill" in such a manner as to damage the goodwill inherent in HRCI's mark.

82.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 6(b) of the License Agreement in that they have combined or authorized others to combine HRCI's HARD ROCK HOTEL & CASINO trademark with the trademark "Toby Keith's I Love This Bar & Grill" in such a manner as to dilute the distinctive qualities of HRCI's trademark.

83.     The knowing and intentional use of HRCI's HARD ROCK HOTEL & CASINO trademark without the authorization of HRCI, but with the full knowledge and direct approval, authorization and participation of HR IP, HR Holdings, HR, Inc., Morgans Hotel, Morgans Management and DLJ, in connection with the above-described Tulsa property as described above, and in other ways, exceeds the scope of the License Agreement and has caused and is likely to cause consumers to believe wrongly that HRCI has either sponsored, authorized or approved of the use of and the services offered under the HARD ROCK HOTEL & CASINO trademark as used or authorized for use by these Defendants.  Such actual and likely confusion has caused and is likely to cause substantial damage to the HARD ROCK Marks and the goodwill inherent therein.  Upon information and belief, such conduct on the part of these

Defendants is willful, intentional and represents a bad-faith effort to trade unfairly on HRCI's goodwill embodied in the HARD ROCK Marks.

84.     The knowing and intentional use of HRCI's HARD ROCK HOTEL & CASINO trademark without the authorization of HRCI, but with the full knowledge and direct approval, authorization and participation of HR IP, HR Holdings, HR, Inc., Morgans Hotel, Morgans Management and DLJ, in connection with the above-described Tulsa property as described above, and in other ways, exceeds the scope of the License Agreement and has diluted and is likely to dilute the goodwill and distinctive quality inherent in HRCI's famous and distinctive HARD ROCK Marks.  Such dilution has caused and is likely to cause substantial damage to the HARD ROCK Marks and the goodwill inherent in them.  Upon information and belief, such conduct on the part of these Defendants is willful, intentional and represents a bad-faith effort to trade unfairly on HRCI's goodwill embodied in the HARD ROCK Marks

85.     HRCI has no adequate remedy at law for any of the misconduct described above and will suffer irreparable harm in the absence of the relief sought herein.

                    (ii)     Albuquerque Property

86.     Defendants HR IP, HR Holdings, HR, Inc., Morgans Hotel, Morgans Management and DLJ have sublicensed or have authorized the sublicensing of the HARD ROCK HOTEL and HARD ROCK CASINO trademarks to at least one other third party, the Pueblo of Isleta Indian tribe, which, upon information and belief, has opened a HARD ROCK HOTEL & CASINO located in Albuquerque, New Mexico.

87.     The HARD ROCK Marks are used at the sublicensed Albuquerque facility in a manner that is inconsistent with the brand image HRCI has cultivated over many years.  Among other things, the range of services, character of the establishment and the experience offered to

customers is incompatible with consumer expectations for goods and services branded with the HARD ROCK Marks.   Upon information and belief, Defendants HR IP, HR Holdings, HR, Inc., Morgans Hotel, Morgans Management and DLJ have failed in their obligations to ensure that the HARD ROCK Marks are used with the services in question in a consistent manner that does not dilute or damage the goodwill embodied in such Marks.

88.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraphs 6(a) and 6(b) of the License Agreement by allowing the HARD ROCK Marks and the goodwill inherent therein to become diluted and damaged through association with services offered at the Albuquerque facility that are inconsistent with the associations consumers have developed with the HARD ROCK Marks.

89.     In addition, upon information and belief, with respect to the sublicensed Albuquerque property, Defendants HR IP, HR Holdings, HR, Inc., Morgans Hotel, Morgans Management and DLJ have sublicensed or have purported to authorize the sublicensing of the HARD ROCK HOTEL & CASINO trademark depicted above in paragraph 75 that is not one of the trademarks whose use or sublicensing is authorized by the License Agreement in that manner.

90.     Such unauthorized sublicensing, as depicted in Exhibit 8 hereto, which shows the use of the above-described trademark on the premises of the Albuquerque property using a graphic presentation that is not authorized by HRCI, is an intentional, material breach of paragraphs 2(b)(iii), 2(b)(vi) and 2(b)(vii) of the License Agreement, which limit the graphic depictions of the HARD ROCK HOTEL and HARD ROCK CASINO trademarks that such Defendants are authorized to use, or to authorize third-party sublicensees to use.

91.     The unauthorized sublicensing of the HARD ROCK HOTEL & CASINO trademark depicted in paragraph 74 above is also an intentional, material breach of paragraphs 6(a) and 6(b) of the License Agreement because it damages the goodwill inherent in HRCI's HARD ROCK Marks and has caused them to become diluted.

92.     Upon information and belief, with respect to the Albuquerque property operated by the Pueblo of Isleta Indian tribe, Defendants HR IP, HR Holdings, HR, Inc., Morgans Hotel, Morgans Management and DLJ have also sublicensed or have purported to authorize the use of HRCI's HARD ROCK CASINO trademark in connection with a live music venue operated by a third party in Albuquerque now called the "Hard Rock Casino Albuquerque Presents the Pavilion."

93.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 10 of the License Agreement by failing to provide HRCI with a copy of the agreement through which the proprietor of the above-described Albuquerque live music venue has been granted the right to use HRCI's HARD ROCK CASINO trademark in connection with such venue.  To the extent no such sublicense exists, the failure of HR IP and HR Holdings to obtain written commitments from the operator of the above-described Albuquerque live music venue regarding the use of the HARD ROCK HOTEL & CASINO trademark and to abide by the terms of the License Agreement is itself a violation of paragraph 10.

94.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 2(a) of the License Agreement by authorizing the proprietor of the above-described Albuquerque live music venue to use HRCI's HARD ROCK CASINO trademark without the consent of HRCI and in a manner that is not permitted by the License Agreement in connection with any live music venue.

95.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 3(d) of the License Agreement by authorizing the operator of the above-described Albuquerque live music venue to use HRCI's HARD ROCK CASINO trademark in such a way that HRCI's trademark is dominated, modified or qualified by the terms that immediately follow it.

96.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 6(a) of the License Agreement by failing to use their best efforts to protect the HARD ROCK CASINO trademarks and the goodwill associated therewith, in that they have combined or authorized others to combine HRCI's HARD ROCK CASINO trademark with other terms in such a manner as to diminish the distinctiveness of that mark and thereby damage the goodwill inherent therein.

97.     Defendants HR IP and HR Holdings have intentionally, materially breached paragraph 6(b) of the License Agreement in that they have combined or authorized others to combine HRCI's HARD ROCK CASINO trademark with other terms in such a manner as to dilute the distinctive qualities of HRCI's mark.

98.     The knowing and intentional use of HRCI's HARD ROCK HOTEL & CASINO and HARD ROCK CASINO trademarks without the authorization of HRCI, but with the full knowledge and direct approval, authorization and participation of HR IP, HR Holdings, HR, Inc., Morgans Hotel, Morgans Management and DLJ, in connection with the above-described Albuquerque live music venue, and with other aspects of the Albuquerque property, exceeds the scope of the License Agreement and has caused and is likely to cause consumers to believe wrongly that HRCI has either sponsored, authorized or approved of the use of, and the services offered under, the HARD ROCK HOTEL & CASINO and HARD ROCK CASINO trademarks

as used or authorized for use by these Defendants.  Such actual and likely confusion has caused

and is likely to cause substantial damage to the HARD ROCK Marks and the goodwill inherent

therein.  Upon information and belief, such conduct on the part of these Defendants is willful,

intentional and represents a bad-faith effort to trade unfairly on HRCI's goodwill embodied in

the HARD ROCK Marks.

99.     The knowing and intentional use of HRCI's HARD ROCK HOTEL & CASINO

and HARD ROCK CASINO trademarks without the authorization of HRCI, but with the full

knowledge and direct approval, authorization and participation of HR IP, HR Holdings, HR, Inc.,

Morgans Hotel, Morgans Management and DLJ, in connection with the above-described

Albuquerque live music venue, and with other aspects of the Albuquerque property, exceeds the

scope of the License Agreement and has caused and is likely to dilute the goodwill and

distinctive quality inherent in HRCI's famous and distinctive HARD ROCK Marks.  Such

dilution has caused and is likely to cause substantial damage to the HARD ROCK Marks and the

goodwill inherent in them.  Upon information and belief, such conduct on the part of these

Defendants is willful, intentional and represents a bad-faith effort to trade unfairly on HRCI's

goodwill embodied in the HARD ROCK Marks.

100.    HRCI has no adequate remedy at law for any of the misconduct described above

and will suffer irreparable harm in the absence of the relief sought herein.

IV.    Unauthorized Registration of Domain Names

101.    Upon information and belief, Defendants HR, Inc., HR IP, HR Holdings,

Morgans Hotel and/or Morgans Management and/or DLJ have currently registered or instigated

the registration by their affiliates or sublicensees of a substantial number of Internet domain

names that contain variations of the HARD ROCK Marks owned exclusively by HRCI, many of

which are not authorized for use under the License Agreement, and the registration of all of which is barred by the License Agreement.

102.    Upon information and belief, included among these Internet domain names are cherokeehardrockhotel.com, hrhpokeronline.com and hardrockroyalty.com, among other domain names that either use HARD ROCK Marks other than HARD ROCK HOTEL and HARD ROCK CASINO, the only trademarks whose use is contemplated by the License Agreement, or that combine the HARD ROCK HOTEL and HARD ROCK CASINO trademarks with other terms in a manner that the License Agreement does not permit, or that otherwise have been wrongly registered in violation of the License Agreement.  A list of the Internet domain names registered by HR, Inc., Morgans Hotel and/or Morgans Management, the registration of which was procured, instigated, sponsored, directed, authorized and/or controlled by Defendants HR IP, HR Holdings and/or DLJ, in violation of the License Agreement is attached as Exhibit 9.

103.    The registration of these domain names by Defendants HR, Inc., Morgans Hotel and/or Morgans Management, which registrations were instigated, sponsored, directed, authorized and/or controlled by Defendants HR IP, HR Holdings and/or DLJ violates paragraphs 2(a), 2(b)(iii), 3(a) and 3(d) of the License Agreement, in that such Defendants are not permitted to register any Internet domain names containing any HARD ROCK Marks, including but not limited to domain names containing: (i) any HARD ROCK Marks whose use is not authorized by the License Agreement; and/or (ii) any HARD ROCK Marks combined with other terms.

## FIRST CLAIM FOR RELIEF

### Breach of Contract – Against Defendants HR IP and HR Holdings

104.    HRCI repeats and realleges each and every allegation set forth in paragraphs 1 through 103 hereof as if fully set forth herein.

105.     HRCI is a party to the License Agreement with HR IP and HR Holdings.

106.     HRCI has performed all of the duties imposed on it in the License Agreement.

107.     HR IP and HR Holdings have intentionally and materially breached the License Agreement as described herein, thereby damaging HRCI.

108.     As a result of such intentional, material breaches of the License Agreement, HRCI is entitled to the termination of the License Agreement, the entry of permanent injunctive relief against the future use by any of the Defendants or third parties in privity with them of any HARD ROCK Marks, an award of compensatory damages in an amount to be determined at trial, pre-judgment and post-judgment interest, and such other and further relief as this Court may deem just and proper.

## SECOND CLAIM FOR RELIEF

### Declaratory Judgment – Against Defendants HR IP and HR Holdings

109.     HRCI repeats and realleges each and every allegation set forth in paragraphs 1 through 108 hereof as if fully set forth herein.

110.     There is an actual controversy between HRCI, HR IP and HR Holdings as to whether the License Agreement remains enforceable in light of the above-described intentional, material breaches perpetrated by HR IP and HR Holdings.

111.     Such controversy is of such immediacy and reality that HRCI is entitled to the entry of a declaratory judgment under 28 U.S.C. § 2201 terminating the License Agreement and barring all future use of any HARD ROCK Marks by HR IP, HR Holdings or any third parties in privity with them.

### THIRD CLAIM FOR RELIEF

### Dilution Under Section 43(c) of the Lanham Act – Against All Defendants

112.    HRCI repeats and realleges each and every allegation set forth in paragraphs 1 through 111 hereof as if fully set forth herein.

113.    Defendants' misconduct, which began after HRCI's HARD ROCK Marks became famous among the general consuming public of the United States, constitutes dilution by blurring and by tarnishment of such HARD ROCK Marks in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

114.    As a result of the aforesaid willful misconduct by Defendants, HRCI has suffered, and will continue to suffer, irreparable injury, and has incurred and will continue to incur, damage in an amount to be determined at trial.

115.    HRCI is entitled to the entry of permanent injunctive relief against the future use by any of the Defendants or third parties in privity with them of any HARD ROCK Marks, an award of compensatory damages in an amount to be determined at trial, an accounting of Defendants' profits, pre-judgment and post-judgment interest, and such other and further relief as this Court may deem just and proper.

### FOURTH CLAIM FOR RELIEF

### Trademark Infringement Under Section 32(1) of the Lanham Act – Against All Defendants

116.    HRCI repeats and realleges each and every allegation set forth in paragraphs 1 through 115 hereof as if fully set forth herein.

117.    Defendants' misconduct described above constitutes trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

118.    As a result of the aforesaid willful misconduct by Defendants, HRCI has suffered, and will continue to suffer, irreparable injury, and has incurred and will continue to incur, damage in an amount to be determined at trial.

119.    HRCI is entitled to the entry of permanent injunctive relief against the future use by any of the Defendants or third parties in privity with them of any trademarks subject to the Hard Rock Registrations, or confusingly similar variations thereof, an award of compensatory damages in an amount to be determined at trial, an accounting of Defendants' profits, pre-judgment and post-judgment interest, and such other and further relief as this Court may deem just and proper.

## FIFTH CLAIM FOR RELIEF

### Unfair Competition Under Section 43(a)(1)(A) of the Lanham Act – Against All Defendants

120.    HRCI repeats and realleges each and every allegation set forth in paragraphs 1 through 119 hereof as if fully set forth herein.

121.    Defendants' misconduct described above constitutes unfair competition in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

122.    As a result of the aforesaid willful misconduct by Defendants, HRCI has suffered, and will continue to suffer, irreparable injury, and has incurred and will continue to incur, damage in an amount to be determined at trial.

123.    HRCI is entitled to the entry of permanent injunctive relief against the future use by any of the Defendants or third parties in privity with them of any HARD ROCK Marks, an award of compensatory damages in an amount to be determined at trial, an accounting of Defendants' profits, pre-judgment and post-judgment interest, and such other and further relief as this Court may deem just and proper.

## SIXTH CLAIM FOR RELIEF

### Violation of the New York Anti-Dilution Statute – Against All Defendants

124.    HRCI repeats and realleges each and every allegation set forth in paragraphs 1

through 123 hereof as if fully set forth herein.

125.    Defendants' conduct will improperly dilute the value of HRCI's distinctive

HARD ROCK Marks in violation of New York General Business Law § 368-l.

126.    As a result of the aforesaid willful misconduct by Defendants, HRCI has suffered,

and will continue to suffer, irreparable injury, and has incurred and will continue to incur,

damage in an amount to be determined at trial.

127.    HRCI is entitled to the entry of permanent injunctive relief against the future use

by any of the Defendants or third parties in privity with them of any HARD ROCK Marks, and

such other and further relief as this Court may deem just and proper.

## SEVENTH CLAIM FOR RELIEF

### Common Law Trademark Infringement – Against All Defendants

128.    HRCI repeats and realleges each and every allegation set forth in paragraphs 1

through 127 hereof as if fully set forth herein.

129.    Defendants' misconduct constitutes trademark infringement under the common

law of the State of New York.

130.    As a result of the aforesaid willful misconduct by Defendants, HRCI has suffered,

and will continue to suffer, irreparable injury, and has incurred and will continue to incur,

damage in an amount to be determined at trial.

131.    HRCI is entitled to the entry of permanent injunctive relief against the future use

by any of the Defendants or third parties in privity with them of any HARD ROCK Marks, an

award of compensatory damages in an amount to be determined at trial, an accounting of Defendants' profits, pre-judgment and post-judgment interest, and such other and further relief as this Court may deem just and proper.

## EIGHTH CLAIM FOR RELIEF

### Common Law Unfair Competition – Against All Defendants

132.    HRCI repeats and realleges each and every allegation set forth in paragraphs 1 through 131 hereof as if fully set forth herein.

133.    Defendants' bad faith misconduct constitutes unfair competition under the common law of the State of New York.

134.    As a result of the aforesaid willful misconduct by Defendants, HRCI has suffered, and will continue to suffer, irreparable injury, and has incurred and will continue to incur, damage in an amount to be determined at trial.

135.    HRCI is entitled to the entry of permanent injunctive relief against the future use by any of the Defendants or third parties in privity with them of any HARD ROCK Marks, an award of compensatory damages in an amount to be determined at trial, an accounting of Defendants' profits, pre-judgment and post-judgment interest, and such other and further relief as this Court may deem just and proper.

### PRAYER FOR RELIEF

WHEREFORE, HRCI respectfully requests that this Court enter judgment as follows:

1.    Declaring that the License Agreement is terminated as a consequence of the material breaches perpetrated by HR IP and HR Holdings, and that any future use of any trademarks owned by HRCI, including but not limited to HARD ROCK HOTEL, HARD ROCK

CASINO or HARD ROCK HOTEL & CASINO, by HR IP, HR Holdings or any third parties in privity with them is barred;

2.      Permanently enjoining Defendants, their officers, subsidiaries, parents, divisions, agents, servants, employees and attorneys, and those persons in active concert or participation with them, or any of them, including but not limited to Defendants' licensees and sublicensees, from: (A) using or authorizing others to use any HARD ROCK Marks in connection with the offering for sale, sale, advertising, promotion, marketing, distribution or dissemination of any goods or services; (B) using or authorizing others to use any variations of the HARD ROCK Marks, including but not limited to HRH, in connection with the offering for sale, sale, advertising, promotion, marketing, distribution or dissemination of any goods or services; (C) using or authorizing others to use any false designation of origin or any other thing that is calculated or likely to cause confusion or mistake in the mind of the trade or public or to deceive the trade or public into believing that Defendants' business or products are in any way associated or affiliated with or related to HRCI or its HARD ROCK Marks; (D) using or authorizing others to use any trademark, service mark, trade name, Internet domain name or other designation of source that is likely to dilute the distinctive quality of HRCI's HARD ROCK Marks, whether by blurring or by tarnishment; and (E) any other conduct that violates HRCI's trademark rights or amounts to unfair competition under either federal or New York law;

3.      Ordering Defendants to transfer to HRCI any and all Internet domain names that contain any of the HARD ROCK Marks or variations thereof, including but not limited to HARD ROCK HOTEL, HARD ROCK CASINO and HRH;

4.      Ordering Defendants to deliver up for destruction all literature, advertising, labels, tags, packaging and products and all other materials bearing any of the HARD ROCK Marks or

variations thereof, including but not limited to HARD ROCK HOTEL, HARD ROCK CASINO

and HRH, pursuant to 15 U.S.C. § 1118;

     5.    Ordering Defendants to file with this Court and serve on HRCI within thirty (30)

days after the service of the final judgment entered in this action a report, in writing, under oath,

setting forth in detail the manner and form in which Defendants have complied with the

injunctive relief awarded to HRCI;

     6.    Ordering Defendants to account to HRCI for any and all profits derived by

Defendants from their misconduct perpetrated in violation of HRCI's contractual, trademark and

other rights;

     7.    Awarding HRCI damages compensating it for harms sustained as a consequence

of Defendants' misconduct as described herein, trebled in accordance with 15 U.S.C. § 1117(a);

     8.    Awarding HRCI its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a), on

the ground that this is an exceptional case;

     9.    Awarding HRCI its costs and disbursements in this action; and

     10.    Granting HRCI such other and further relief as this Court may deem just and

proper.

## JURY DEMAND

HRCI demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: New York. New York
September 21, 2010

DORSEY & WHITNEY LLP

By: _____

Bruce R. Ewing (BE-0724)
Brooke E. Pietrzak (BP-7314)
Gianfranco G. Mitrione (GM-8618)
250 Park Avenue
New York, New York 10177

Attorneys for Plaintiff
Hard Rock Cafe International (USA),
Inc.

# EXHIBIT 1



# EXHIBIT 2

Int. Cls.: 25, 35, 41, and 42

Prior U.S. Cls.: 22, 39, 100, 101, 102, and 107

**United States Patent and Trademark Office**

Reg. No. 2,478,328
Registered Aug. 14, 2001

## TRADEMARK
## SERVICE MARK
### PRINCIPAL REGISTER

## HARD ROCK

HARD ROCK CAFE INTERNATIONAL (USA), INC. (FLORIDA CORPORATION)
6100 OLD PARK LANE
ORLANDO, FL 32835

FOR: CLOTHING, NAMELY T-SHIRTS, POLO SHIRTS, SWEATSHIRTS, SPORT SHIRTS, CAPS, HATS AND JACKETS, BELTS, AND SUN VISORS, IN CLASS 25 (U.S. CLS. 22 AND 39).

FIRST USE 4-30-1999; IN COMMERCE 4-30-1999.

FOR: RETAIL STORE SERVICES FEATURING CLOTHING, PINS, PHOTOGRAPHS, ARTWORK AND JEWELRY, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 3-31-2001; IN COMMERCE 3-31-2001.

FOR: ENTERTAINMENT, NAMELY, LIVE MUSIC CONCERTS, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 3-31-2001; IN COMMERCE 3-31-2001.

FOR: RESTAURANT, BAR AND TAKE-OUT FOOD SERVICES , IN CLASS 42 (U.S. CLS. 100 AND 101).

FIRST USE 3-31-2001; IN COMMERCE 3-31-2001.

OWNER OF U.S. REG. NOS. 1,397,180, 2,120,014, AND OTHERS.

SEC. 2(F) AS TO SERVICES IN INTERNATIONAL CLASS 41.

SN 75-485,882, FILED 5-15-1998.

AMY GEARIN, EXAMINING ATTORNEY

Int. Cl.: 42

Prior U.S. Cl.: 100

Reg. No. 1,397,180

## United States Patent and Trademark Office    Registered June 10, 1986

## SERVICE MARK
## PRINCIPAL REGISTER

## HARD ROCK CAFE

HARD ROCK CAFE LICENSING CORPORA-
TION (NEW YORK CORPORATION)
211 W. 57TH STREET
NEW YORK, NY 10019 , ASSIGNEE OF
MORTON, PETER A. (UNITED STATES CITI-
ZEN) LOS ANGELES, CA 90265

FOR: RESTAURANT SERVICES, IN CLASS
42 (U.S. CL. 100).

FIRST USE 0-0-1978; IN COMMERCE
0-0-1978.
NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "CAFE", APART FROM THE
MARK AS SHOWN.

SER. NO. 397,951, FILED 9-30-1982.

DAVID A. HERDMAN, EXAMINING ATTOR-
NEY

Int. Cl.: 25

Prior U.S. Cl.: 39

Reg. No. 1,504,904

## United States Patent and Trademark Office

Registered Sep. 20, 1988

## TRADEMARK
### PRINCIPAL REGISTER

## HARD ROCK CAFE

HARD ROCK CAFE LICENSING CORPORA-
TION (NEW YORK CORPORATION)
SUITE 1614
818 OLIVE STREET
ST. LOUIS, MO 63101

FOR: T-SHIRTS, SWEATSHIRTS, POLO
SHIRTS, SPORT SHIRTS, JACKETS, HATS,
CAPS, BOLO TIES, BELTS, AND SUN VISORS,
IN CLASS 25 (U.S. CL. 39).

FIRST USE 12-1-1981; IN COMMERCE
12-1-1981.

OWNER OF U.S. REG. NOS. 1,397,180, 1,408,637
AND OTHERS.

SER. NO. 658,782, FILED 5-4-1987.

DAVID SOROKA, EXAMINING ATTORNEY

Int. Cl.: 42

Prior U.S. Cl.: 100

## United States Patent and Trademark Office

Reg. No. 1,398,940
Registered June 24, 1986

### SERVICE MARK
### PRINCIPAL REGISTER



HARD ROCK CAFE LICENSING CORPORA-TIION (NEW YORK CORPORATION)
211 W. 57TH STREET
NEW YORK, NY 10019 , ASSIGNEE BY MESNE ASSIGNMENT TIGRETT, ISAAC B. (UNITED STATES CITIZEN), DBA TIGRETT INDUS-TRIES JACKSON, TN 38301

FOR: RESTAURANT AND PREPARED TAKE-OUT FOOD SERVICES, IN CLASS 42 (U.S. CL. 100).

FIRST USE 9–27–1982; IN COMMERCE 9–27–1982.
NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "CAFE", APART FROM THE MARK AS SHOWN.
THE DRAWING IS LINED TO REPRESENT THE COLORS BROWN AND ORANGE.

SER. NO. 399,618, FILED 10–6–1982.

DAVID A. HERDMAN, EXAMINING ATTOR-NEY

Int. Cl.: 25

Prior U.S. Cl.: 39

**United States Patent and Trademark Office**

Reg. No. 1,408,637
Registered Sep. 9, 1986

## TRADEMARK
### PRINCIPAL REGISTER



HARD ROCK CAFE LICENSING CORPORA-
TION (NEW YORK CORPORATION)
SUITE 1614
818 OLIVE STREET
ST. LOUIS, MO 63101

FOR: T-SHIRTS, IN CLASS 25 (U.S. CL. 39).

FIRST USE 12-1-1981; IN COMMERCE
12-1-1981.

SER. NO. 581,481, FILED 2-6-1986.

DAVID A. HERDMAN, EXAMINING ATTOR-
NEY

Int. Cl.: **42**

Prior U.S. Cls.: **100 and 101**

## United States Patent and Trademark Office

Reg. No. 1,909,483
Registered Aug. 1, 1995

### SERVICE MARK
### PRINCIPAL REGISTER

## HARD ROCK HOTEL

HARD ROCK CAFE LICENSING CORPORA-
TION (NEW YORK CORPORATION)
C/O 345 NORTH MAPLE DRIVE
SUITE 200, MAPLE PLAZA
BEVERLY HILLS, CA 90210

    FOR: HOTEL SERVICES, IN CLASS 42 (U.S.
CLS. 100 AND 101).

FIRST USE 3–10–1995; IN COMMERCE
3–10–1995.
    NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "HOTEL", APART FROM THE
MARK AS SHOWN.

    SN 74–178,269, FILED 6–20–1991.

DONNA MIRMAN, EXAMINING ATTORNEY

Int. Cl.: 41

Prior U.S. Cls.: 100, 101 and 107

**Reg. No. 2,031,803**

## United States Patent and Trademark Office

**Registered Jan. 21, 1997**

## SERVICE MARK
### PRINCIPAL REGISTER

### HARD ROCK HOTEL

HARD ROCK CAFE LICENSING CORPORA-
TION (NEW YORK CORPORATION)
345 NORTH MAPLE DRIVE, SUITE 200
MAPLE PLAZA
BEVERLY HILLS, CA 90210

FOR: CASINO SERVICES, IN CLASS 41 (U.S.
CLS. 100, 101 AND 107).

FIRST USE 4–30–1995; IN COMMERCE
4–30–1995.
OWNER OF U.S. REG. NOS. 1,397,180, 1,909,483
AND OTHERS.

SER. NO. 75–000,001, FILED 10–2–1995.

STEVEN R. FOSTER, EXAMINING ATTORNEY

Int. Cl.: 25

Prior U.S. Cls.: 22 and 39

Reg. No. 2,038,394

## United States Patent and Trademark Office

Registered Feb. 18, 1997

## TRADEMARK
### PRINCIPAL REGISTER

## HARD ROCK HOTEL

HARD ROCK CAFE LICENSING CORPORA-
TION (NEW YORK CORPORATION)
345 NORTH MAPLE DRIVE, SUITE 200
MAPLE PLAZA
BEVERLY HILLS, CA 90210

FOR: SWEATSHIRTS, T-SHIRTS, TANK TOPS, JACKETS, SUSPENDERS, BATHROBES, DRESSES, SOCKS, HATS, SHORTS, PANTS, NIGHTSHIRTS, BANDANNAS, BOXER SHORTS, BOLO TIES, BATHING SUITS, AND BELTS, IN CLASS 25 (U.S. CLS. 22 AND 39).

FIRST USE 4–30–1995; IN COMMERCE 4–30–1995.

OWNER OF U.S. REG. NOS. 1,397,180, 1,909,483 AND OTHERS.

SER. NO. 75–000,691, FILED 10–2–1995.

STEVEN R. FOSTER, EXAMINING ATTORNEY

Int. Cls.: 41 and 42

Prior U.S. Cls.: 100, 101, and 107

## United States Patent and Trademark Office

Reg. No. 2,789,028

Registered Dec. 2, 2003

## SERVICE MARK
**PRINCIPAL REGISTER**

# HARD ROCK CASINO

HARD ROCK CAFE INTERNATIONAL (USA), INC. (FLORIDA CORPORATION)
6100 OLD PARK LANE
ORLANDO, FL 32835

FOR: CONDUCTING ENTERTAINMENT EXHIBITIONS IN THE NATURE OF LIVE MUSIC, MUSIC FESTIVALS AND CASINO SERVICES, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 5-9-2003; IN COMMERCE 5-9-2003.

FOR: RESTAURANT, BAR AND TAKE-OUT FOOD SERVICES AND HOTEL SERVICES, IN CLASS 42 (U.S. CLS. 100 AND 101).

FIRST USE 5-9-2003; IN COMMERCE 5-9-2003.

OWNER OF U.S. REG. NOS. 1,397,180, 2,120,014, AND OTHERS.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "CASINO", APART FROM THE MARK AS SHOWN.

SEC. 2(F) AS TO "HARD ROCK".

SN 75-511,501, FILED 7-1-1998.

AMY GEARIN, EXAMINING ATTORNEY

Int. Cls.: **14, 18, and 25**

Prior U.S. Cls.: **1, 2, 3, 22, 27, 28, 39, 41, and 50**

**Reg. No. 2,499,114**

United States Patent and Trademark Office

**Registered Oct. 16, 2001**

## TRADEMARK
### PRINCIPAL REGISTER

## HARD ROCK CASINO

HARD ROCK CAFE INTERNATIONAL (USA), INC. (FLORIDA CORPORATION)
5401 KIRKMAN ROAD
ORLANDO, FL 32819

FOR: JEWELRY, NAMELY, ORNAMENTAL LA-PEL PIN THE SHAPE OF A GUITAR, SPORTS WATCHES, GOLD WATCHES, CLASSIC WATCHES, NECKLACES, AND EARRINGS, IN CLASS 14 (U.S. CLS. 2, 27, 28 AND 50).

FIRST USE 1-1-2001; IN COMMERCE 4-9-2001.

FOR: BACK PACKS, FANNY PACKS AND TOTE BAGS, IN CLASS 18 (U.S. CLS. 1, 2, 3, 22 AND 41).

FIRST USE 1-1-2001; IN COMMERCE 4-9-2001.

FOR: CLOTHING, NAMELY T-SHIRTS, SWEAT-SHIRTS, POLO SHIRTS, SPORT SHIRTS, JACKETS, HATS, CAPS, BELTS, AND SUN VISORS, IN CLASS 25 (U.S. CLS. 22 AND 39).

FIRST USE 1-1-2001; IN COMMERCE 4-9-2001.

OWNER OF U.S. REG. NOS. 1,397,180, 2,120,014, AND OTHERS.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "CASINO", APART FROM THE MARK AS SHOWN.

SEC. 2(F) AS TO "HARD ROCK".

SN 75-981,081, FILED 7-1-1998.

DEIRDRE GILLIS, EXAMINING ATTORNEY

**Int. Cl.: 41**

**Prior U.S. Cls.: 100, 101 and 107**

**Reg. No. 2,349,579**

## United States Patent and Trademark Office

**Registered May 16, 2000**

### SERVICE MARK
### PRINCIPAL REGISTER

## HARD ROCK LIVE

HARD ROCK CAFE INTERNATIONAL (USA), INC. (FLORIDA CORPORATION)
5401 KIRKMAN ROAD, SUITE 200
ORLANDO, FL 32819

FOR: ENTERTAINMENT, NAMELY, LIVE MUSIC CONCERTS, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).

FIRST USE 6-0-1997; IN COMMERCE 6-0-1997.

OWNER OF U.S. REG. NOS. 1,397,180, 2,120,014 AND OTHERS.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "LIVE", APART FROM THE MARK AS SHOWN.

SEC. 2(F) AS TO "HARD ROCK".

SER. NO. 75-569,066, FILED 10-13-1998.

JODI LAUTERBACH, EXAMINING ATTORNEY

Int. Cl.: 42

Prior U.S. Cls.: 100 and 101

**United States Patent and Trademark Office**

Reg. No. 2,373,803

Registered Aug. 1, 2000

## SERVICE MARK
### PRINCIPAL REGISTER

## HARD ROCK LIVE

HARD ROCK CAFE INTERNATIONAL (USA), INC.
  (FLORIDA CORPORATION)
5401 KIRKMAN ROAD, SUITE 200
ORLANDO, FL 32819

FOR: FOOD PREPARATION, RESTAURANTS AND CONTRACT FOOD SERVICES, IN CLASS 42 (U.S. CLS. 100 AND 101).

FIRST USE 1–0–1999; IN COMMERCE 1–0–1999.

OWNER OF U.S. REG. NOS. 2,029,870, 2,120,014, AND OTHERS.

SN 75–550,140, FILED 9–9–1998.

JODI LAUTERBACH, EXAMINING ATTORNEY

Int. Cl.: 25

Prior U.S. Cls.: 22 and 39

United States Patent and Trademark Office

Reg. No. 2,561,989
Registered Apr. 16, 2002

## TRADEMARK
### PRINCIPAL REGISTER

## HARD ROCK LIVE

HARD ROCK CAFE INTERNATIONAL (USA), INC. (FLORIDA CORPORATION)
6100 OLD PARK LANE
ORLANDO, FL 32835

FOR: APPAREL, NAMELY-T-SHIRTS, POLO SHIRTS, SWEATSHIRTS, CAPS, HATS AND JACKETS, IN CLASS 25 (U.S. CLS. 22 AND 39).

FIRST USE 12-1-1998; IN COMMERCE 12-1-1998.

OWNER OF U.S. REG. NOS. 2,349,514, 2,375,996 AND OTHERS.

SER. NO. 78-056,353, FILED 4-2-2001.

ELVIA GASTELO, EXAMINING ATTORNEY

# EXHIBIT 3

TRADEMARK LICENSE and COOPERATION AGREEMENT

by and between

RANK LICENSING, INC.

and

PETER A. MORTON

Dated:  as of June 7, 1996

(200D7C58.V1J)

# TABLE OF CONTENTS

Section                                                                    Page

1.    DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.    GRANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

3.    RESERVATION AND OWNERSHIP OF RIGHTS . . . . . . . . . . . . . 4

4.    QUALITY, NOTICES, APPROVALS, AND SAMPLES . . . . . . . . . . . 5

5.    ARBITRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6.    TRADEMARK AND COPYRIGHT PROTECTION AND INFRINGEMENTS . . . 7

7.    INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . 7

8.    JOINT COOPERATION . . . . . . . . . . . . . . . . . . . . . . . . . 7

9.    TERM AND OPTIONS . . . . . . . . . . . . . . . . . . . . . . . . . 8

10.   SUBLICENSE AND FRANCHISE RIGHTS . . . . . . . . . . . . . . . . 9

11.   ENFORCEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

12.   NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

13.   RELATIONSHIP OF THE PARTIES . . . . . . . . . . . . . . . . . . . 10

14.   APPLICABLE LAW AND DISPUTES . . . . . . . . . . . . . . . . . . 10

15.   SEVERABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

16.   SURVIVABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

17.   INTEGRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18.   BINDING EFFECT . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

19.   AUTHORITY OF LICENSOR . . . . . . . . . . . . . . . . . . . . . . 11

20.   ENFORCEABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . 11

21.   NONCONTRAVENTION . . . . . . . . . . . . . . . . . . . . . . . . 11

22.   WAIVER OF TERMS . . . . . . . . . . . . . . . . . . . . . . . . . . 11

23.   AMENDMENT OF AGREEMENT . . . . . . . . . . . . . . . . . . . . 11

LIST OF DEFINITIONS USED . . . . . . . . . . . . . . . . . . . . . . . . . 13